IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ALICIA WOODS, *as Guardian Ad Litem for R.W., a minor child, and individually,* | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:19CV1018 |
| CHAPEL HILL-CARRBORO CITY SCHOOLS BOARD OF EDUCATION; NANCY KUEFFER, *in her individual and official capacity*; CHERYL CARNAHAN, *in her individual and official capacity*; ELIZABETH CLARY, *in her individual and official capacity*; and RONNIE JACKSON, *in her individual and official capacity*, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff Alicia Woods brings this action on behalf of herself and her minor son, R.W., against the Chapel Hill-Carrboro City Schools Board of Education (the "Board") and several school administrators (the "Individual Defendants"). (ECF No. 1.) The complaint alleges that R.W. was repeatedly sexually abused by older students on school premises, and that, although they were aware of this abuse, Defendants "failed to promptly and appropriately investigate and respond." (*See id.* ¶¶ 1, 39.) Before the Court are the Defendants' motions to dismiss. (ECF Nos. 16; 19.) For the reasons that follow, the motions will be granted in part and denied in part.

1

## I.     BACKGROUND

R.W. is a minor child with substantial behavioral difficulties. (*See, e.g.*, ECF No. 1 ¶¶ 2, 22–23.) He attended Estes Hills Elementary School in the Chapel Hill-Carrboro City School District at all times relevant to this case. (*Id.* ¶¶ 6–7.) The allegations of the complaint, accepted as true and viewed in the light most favorable to Plaintiff, show the following:

R.W. lost control of his behavior one day in the Spring of 2011. (*Id.* ¶ 34.) After his teacher Lucy Hayes ("Hayes") removed him to a "timeout room" to calm down, he began to cry. (*Id.*) Through "tears and rapid breathing," R.W. told Hayes that he was "upset about kids showing their private parts." (*Id.*) While Hayes could not understand much of what R.W. was saying—he was crying throughout their conversation—it was "apparent" to her that he had experienced "inappropriate and unwanted sexual conduct." (*See id.*)

Realizing that "the behavior R.W. was describing warranted immediate action," Hayes took R.W. to the principal's office. (*Id.* ¶ 35.) The principal, Defendant Cheryl Carnahan ("Carnahan"), was unavailable at the time. (*Id.*) However, the assistant principal, Defendant Elizabeth Clary ("Clary") agreed to speak with R.W. in her stead. (*Id.*) Clary assured Hayes that she would finish the sensitive discussion Hayes had started with R.W. and arrange for him to be taken home afterwards. (*Id.*)

As the day went on, however, Hayes began to doubt whether the "situation" with R.W. was being "taken seriously." (*Id.* ¶ 36.) She asked another teacher, Caroline Carlson ("Carlson"), if she would join her in speaking with Carnahan about R.W.'s disclosure. (*See id.*) Carlson agreed, and the next morning accompanied Hayes to a meeting with Carnahan and Defendant Ronnie Jackson, a guidance counselor at the school. (*See id.* ¶¶ 36–37.) At the

2

meeting, Hayes and Carlson proposed that the school interview students that may have been engaged in the conduct described by R.W., notify those students' parents, and contact the Department of Social Services.  (*Id.* ¶ 37.)  However, Carnahan insisted that the situation was already "being handled" appropriately and instructed the teachers to "stay out of it."  (*See id.*)

Approximately a year after these events, in April 2012, Taylor Mazor ("Mazor") was hired to work with the high-needs students at Estes Hill as a mental health clinician.  (*Id.* ¶ 22.) Not long into her tenure, Mazor began to suspect that R.W. and another student—identified in the complaint as "Student X"—were displaying symptoms of post-traumatic stress disorder stemming from past sexual abuse.  (*Id.* ¶ 23.)  Her suspicions were confirmed when, sometime in the Spring of 2013, Student X confided that he, R.W., and a third classmate had been repeatedly sexually abused by two older students—in the school's cafeteria, bathrooms, and hallways; on the playground at recess; and on the school bus—from 2009 to 2011.  (*See id.*) Mazor spoke with R.W. shortly thereafter and asked whether he, too, had been sexually abused.  (*Id.* ¶ 25.)  In response, R.W. provided an account of recurrent abuse "consistent with Student X's account."  (*See id.*)

After learning of the alleged abuse, Mazor notified R.W.'s current teacher, the school's social worker, and Carnahan's successor at Estes Hills, Principal Andrew Ware ("Ware").  (*Id.* ¶¶ 27–28.)  Ware, in turn, alerted the District Office, which sent two representatives to meet with Mazor.  (*Id.* at 28.)  The representatives acknowledged to Mazor that they were aware of "the incidents" involving R.W. and Student X, but told her not to investigate further, as "the situation had been resolved before her time."  (*Id.*)

The "resolution" referenced purportedly had three components. First, around the time of Hayes's initial report of suspected abuse, the administration removed the student thought to be the primary abuser from the school bus (though it is unclear for how long). (*Id.* ¶ 38.) Monitors were also placed on the bus "for a short period of time." (*Id.*) Second, the District Office sent notification letters to the parents and guardians of the students involved. (*Id.* ¶ 28.) Third, the District Office sought assistance in handling the matter from the Orange County Rape Crisis Center ("OCRCC" or the "Center"). (*Id.*) The representatives told Mazor that OCRCC had provided individual assessments and somewhere between one and three counseling sessions to each boy claiming abuse. (*Id.*; ECF No. 2-1 at 3.)

Mazor was clearly skeptical of this supposed "resolution," since she took it upon herself to investigate whether the actions described above were in fact taken. (*See* ECF No. 2-1 at 3.) She confirmed that the school had placed monitors on and removed a suspected student from the school bus around the time the alleged abuse was occurring. (ECF No. 1 ¶ 28.) However, when she independently reached out to OCRCC, she learned that the Center "had not provided any services to R.W. or Student X" aside from a puppet show—generic in nature, and given to the students' entire class—on the topic of unsafe touching. (*See id.* ¶¶ 28, 38.)

After her meeting with the representatives, Defendant Nancy Kueffer ("Kueffer"), a program director at Estes Hills, had warned Mazor that Student X and R.W. were "manipulative" and "not to be believed." (*Id.* ¶ 29.) Nevertheless, Mazor made the decision to meet privately with Plaintiff after a May 8, 2013 parent–teacher conference to discuss the topic of abuse. (*Id.* ¶ 30.)

4

That was the first time Plaintiff was informed that her son may have been sexually abused at school. (*Id.*) Contrary to what the District Office's representatives had told Mazor, Plaintiff never received a letter or notification about R.W.'s conversations with teachers and administrators.[1] (*Id.* ¶ 30.) Moreover, "no students were interviewed" about the alleged sexual abuse, and aside from temporarily removing the suspected primary abuser from the school bus, "[t]he perpetrators were never evaluated, treated, confronted, or disciplined for their involvement in the sexual abuse of R.W., Student X, or any other student." (*Id.* ¶ 38.)

According to Plaintiff, this inaction allowed "the sexual abuse of R.W. [to] continue[ ] for at least many months after the school was made aware of the same." (*Id.*) She filed this suit for damages on October 2, 2019. (*Id.* at 22.)

## II. LEGAL STANDARDS

Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (ECF Nos. 16 at 1; 19 at 1.) Under Rule 12(b)(1), a party may seek dismissal based on the court's lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion under Rule 12(b)(1) raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). The burden of proving subject-matter jurisdiction rests with the plaintiff, and the district court may "consider

---

[1] Mazor later asked one of the District Office representatives for a copy of the letter they supposedly sent to Plaintiff and the guardians of the other two boys. (*Id.* ¶ 31.) She was eventually provided with a letter that was mailed to the families of all students in the boys' classroom, stating that OCRCC "would be coming to put on a puppet show." (*Id.*) According to the complaint, that letter was "not unlike a general letter sent to parents/guardians of students before starting a sex-education curriculum." (*Id.*)

5

evidence by affidavit . . . without converting the proceeding to one for summary judgment." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Rule 12(b)(2) provides that an action may be dismissed for lack of personal jurisdiction. *See* Fed. R. Civ. P. 12(b)(2). On a personal jurisdiction challenge, the plaintiff bears the burden of ultimately proving personal jurisdiction by a preponderance of the evidence. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Where, as here, a court decides a pretrial personal jurisdiction question without conducting an evidentiary hearing— "reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint"—a plaintiff "need only make a prima facie showing of personal jurisdiction" to withstand dismissal. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[A] plaintiff makes a prima facie showing of personal jurisdiction by presenting facts that, if true, would support jurisdiction over the defendant." *See Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 561 (4th Cir. 2014) (citing *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003)). Allegations in the complaint are taken as true, though "only if they are not controverted by evidence from the defendant." *Vision Motor Cars, Inc. v. Valor Motor Co.*, 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013). If both sides present evidence, "factual conflicts must be resolved in favor of the party asserting jurisdiction for the limited purpose of determining whether a prima facie showing has been made." *Id.*

Finally, a motion to dismiss filed pursuant to Rule 12(b)(6) "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In assessing a claim's plausibility, a court must draw all reasonable inferences in the plaintiff's favor.  *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013).  However, "mere conclusory and speculative allegations" are insufficient, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013), and a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Vitol*, 708 F.3d at 548 (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006)).

## III.   DISCUSSION

Plaintiff brings several claims against the Defendants: Count I of the complaint alleges that the Board subjected R.W. to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").  (ECF No. 1 ¶¶ 40–54.)  Count II contains a § 1983 claim against all Defendants, alleging violations of the Equal Protection Clause of the Fourteenth Amendment.  (*Id.* ¶¶ 55–64.)  Counts III through VII allege various state law claims sounding in negligence and the infliction of emotional distress.  (*Id.* ¶¶ 65–92.)  Count VIII, the final claim in the complaint, asserts that the Defendants violated certain rights secured by the North Carolina Constitution.  (*Id.* ¶¶ 93–99.)  The Defendants move to dismiss all claims.

### A.  Title IX

The Court begins with Plaintiff's Title IX claim against the Board.  Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance."[2]

---

[2] The Supreme Court has long held that victims of sex discrimination are entitled to pursue private causes of action under Title IX against federally-funded educational institutions.  *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979).

7

20 U.S.C. § 1681(a). In *Davis v. Monroe County Board of Education*, the Supreme Court clarified that sexual harassment falls within the "discrimination" that Title IX prohibits. *See* 526 U.S. 629, 649–50 (1999). However, covered institutions may be held liable for student-on-student sexual harassment—as is alleged here—"only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Thus, "*Davis* sets the bar high for deliberate indifference." *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 76 (4th Cir. 2016). "[A] school may not be held liable under Title IX . . . for what its students do, but only for what is effectively an official decision by the school not to remedy student-on-student harassment." *Id.* at 76–77. To that end, schools are afforded "a great deal of 'flexibility' in disciplining students who sexually harass other[s]." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018) (quoting *Davis*, 526 U.S. at 648). Further, because administrators are entitled to "substantial deference" in how they choose to address student-on-student harassment, *S.B.*, 819 F.3d at 77, schools are "not normally liable for failing to cede to a harassment victim's specific remedial demands," *Feminist Majority*, 911 F.3d at 686.

This deference is not absolute, however. A school still violates Title IX "when [its] response—or lack thereof—to known student-on-student sexual harassment is 'clearly unreasonable'" in light of the circumstances. *Id.* (quoting *Davis*, 526 U.S. at 648). For instance, deliberate indifference may be shown "where [a] school 'dragged its feet' before implementing 'little more than half-hearted measures'" to curb known harassment. *See S.B.*, 819 at 77

8

(quoting *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–70 (2d Cir. 2012) ("Responses that are not reasonably calculated to end harassment are inadequate.")).

In line with *Davis* and its progeny, the Fourth Circuit has recognized that, in order to advance a Title IX sexual harassment claim, a plaintiff must plausibly allege four elements: (1) that she was a student at an educational institution receiving federal funds; (2) that she was subjected to harassment based on her sex; (3) that the harassment was sufficiently severe or pervasive to create a hostile or abusive educational environment; and (4) that there is a basis for imputing liability to the institution. *See Feminist Majority*, 911 F.3d at 686 (citing *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)). For present purposes, the Board concedes that the first and second elements are satisfied, but contends that the third and fourth elements have not been adequately alleged. (*See* ECF Nos. 17 at 12–14; 27 at 2–5.)

> i.     *Plaintiff has adequately alleged harassment that was sufficiently severe or pervasive.*

The Board first argues that Plaintiff has failed to allege sufficient facts to satisfy the third element of her Title IX claim—harassment that was severe or pervasive enough to create a hostile educational environment. (ECF No. 17 at 12.) Whether student-on-student abuse rises to the level of actionable harassment "depends on a constellation of surrounding circumstances, expectations, and relationships." *See Davis*, 526 U.S. at 651 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)). The list of considerations includes, but is not limited to: the ages of the harassers and victims; whether the alleged harassment was frequent, humiliating, or physically threatening; and whether the conduct occurred within "a general atmosphere of hostility." *See Jennings*, 482 F.3d at 696. However, lest a claim become untethered from Title IX's language and purpose, the key inquiry must always be whether the

9

harassment rises to a level that is "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." *See Davis*, 526 U.S. at 652.

Having reviewed the complaint and accompanying affidavits,[3] the Court finds that Plaintiff has plausibly alleged that R.W. suffered sexual harassment that was sufficiently pervasive and severe to satisfy the third element of her Title IX claim. As detailed above, the complaint alleges that R.W. and two other boys endured frequent sexual abuse at the hands of two older students over the course of several years. (ECF No. 1 ¶¶ 23–25.) The alleged conduct—"repeated sexual touching and manipulation of the children's genitalia and anuses"—occurred throughout the school grounds and on the bus. (*Id.* ¶¶ 23–24.) Further, as Hayes and Mazor relay in their affidavits, the older students would sometimes use a code word ("hot dog") to "trigger distress in the victims," even in the presence of teachers. (*See* ECF Nos. 2-1 at 2; 2-2 ¶ 4.) When the boys heard that term, they "would become hysterical, volatile, tearful, and terrified." (ECF No. 2-1 at 2.)

Even accounting for R.W.'s preexisting behavioral challenges, the alleged abuse clearly affected his ability to function in the classroom. Estes Hills became "a place of fear, rage, and punishment" for R.W., rather than "a safe place . . . to learn and grow." (*Id.*) "Common sense" tells us that the education of *any* child in R.W.'s position would be severely

---

[3] When resolving a motion to dismiss, the Court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits" without converting the motion into one for summary judgment. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (internal citations omitted). Here, Plaintiff has attached affidavits by Mazor and Hayes to her complaint, (*see* ECF Nos. 2-1; 2-2), which expressly incorporates them by reference, (*see* ECF No. 1 ¶¶ 32, 33). Accordingly, the Court may, and does, consider their affidavits. *See Lowe v. Fed. Deposit Ins. Corp.*, No. ELH-18-478, 2019 WL 2772450, at *6 (D. Md. July 2, 2019).

compromised by the alleged harassment. *See Jennings*, 482 F.3d at 696 (quoting *Oncale*, 523 U.S. at 81–82). However, there is no need to speculate. According to Mazor, teachers routinely mistook R.W.'s abuse-related PTSD symptoms for ordinary trouble-making, leading to "constant disciplinary issues, . . . physical restraint, removal from learning opportunities, suspensions[,] and continued isolation from [his] peers," (ECF No. 2-1 at 2), thus denying him "the equal access to education that Title IX is designed to protect," *Davis*, 526 U.S. at 652.

The Board unpersuasively argues that the complaint's lack of certain factual allegations—for instance, that R.W.'s grades declined, or that he had excessive absences from school—means that Plaintiff cannot "evince a deprivation of educational opportunities." (*See* ECF No. 17 at 10, 13.) However, as discussed above (and as the Board itself acknowledges, (*see id.* at 11)), the question of whether sexual harassment is sufficiently severe or pervasive must be answered in light of all the circumstances. *See Jennings*, 482 F.3d at 699–700 (finding that a student sufficiently alleged a deprivation of educational opportunity, despite the fact that her grades improved during the relevant period). Taken as true, the allegations in the complaint and accompanying affidavits depict harassment that was "sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity," *Feminist Majority*, 911 F.3d at 686, even absent allegations that R.W.'s grades suffered, or that he routinely missed school.

### ii. *Plaintiff has adequately alleged deliberate indifference.*

Next, the Board argues that Plaintiff's Title IX claim is "untenable for its failure to adequately allege deliberate indifference," the only available basis on which to impute liability for student-on-student abuse to an educational institution. (ECF No. 17 at 13.) The complaint

11

alleges that, after learning of R.W.'s initial disclosure from Hayes, administrators (1) removed the student believed to be R.W.'s primary abuser from the school bus; (2) placed staff on the bus as monitors for some time; and (3) arranged for OCRCC to give a puppet show to R.W.'s class on the topic of unsafe touching. (*See* ECF No. 1 ¶¶ 28, 38.) The Board contends that these "corrective efforts to address the allegations of abuse against R.W." show that it was not deliberately indifferent to the alleged harassment. (ECF No. 27 at 5.)

As noted above, educators "are entitled to substantial deference when they calibrate a disciplinary response to student-on-student . . . harassment." *S.B.*, 819 F.3d at 77. However, a school does not automatically become immune to Title IX liability whenever it takes some corrective action; rather, the responsive steps must be "reasonably calculated to end the harassment." *See Feminist Majority*, 911 F.3d at 689 (citing *Zeno*, 702 F.3d at 669). Evidence may later emerge showing that the school's remedial actions were within the range of reasonable responses. At this early stage, however, the Court finds that Plaintiff has plausibly alleged that the school's response was "clearly unreasonable," such that it "cause[d]" R.W. to undergo further harassment or, at the very least, remain "liable or vulnerable to it." *Davis*, 526 U.S. at 645, 648.

According to the complaint, older students continued to abuse R.W. "for at least many months" after Hayes brought the matter to the administration's attention. (ECF No. 1 ¶ 38.) While the decision was made to supervise and remove one student from R.W.'s school bus, there is no indication that the school attempted to monitor the many other locations where harassment allegedly occurred—the cafeteria, bathrooms, hallways, and playground. (*See id.* ¶ 23.) According to Plaintiff, "no students were interviewed" about the alleged abuse, and "[t]he

Case 1:19-cv-01018-LCB-JEP   Document 29   Filed 06/09/20   Page 12 of 24

perpetrators were never evaluated, treated, confronted[,] or disciplined." (*Id.* ¶ 38.) Further, portions of the complaint suggest that members of the school's administration were actively "trying to sweep what was occurring under the rug," (*id.* ¶ 37), were disinclined to take R.W.'s allegations seriously, (*id.* ¶¶ 29, 36), and, when given the chance, misrepresented the strength of their response to their own concerned staff, (*id.* ¶ 28). In essence, the allegations show a brief sequence of half-hearted measures, during and after which R.W. was further harassed. The most unsettling aspect of this lackluster response, if true, is that Plaintiff wasn't even notified that her elementary-aged son had told a teacher that he was being sexually abused. (*Id.* ¶ 30.) Surely a response which fails to inform parents that their children may have been abused is "clearly unreasonable" under the circumstances.

In light of these allegations, the Court concludes that it is plausible that administrators were aware of severe and pervasive student-on-student sexual abuse, but responded with deliberate indifference. *See Davis*, 526 U.S. at 633. Accordingly, Plaintiff's Title IX claim against the Board may advance.

## B. Section 1983 Equal Protection

All Defendants move to dismiss Plaintiff's § 1983 claim for "violations of rights secured by the Equal Protection Clause of the Fourteenth Amendment." (ECF No. 1 ¶¶ 55–64.) Though there may be significant overlap between the two, the Supreme Court has held that a plaintiff is not precluded from bringing a § 1983 equal protection claim for sex discrimination alongside a Title IX claim in a case involving student-on-student sexual harassment. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). The "standards establishing liability" under Title IX and § 1983 are "similar, but not 'wholly congruent.'" *Feminist Majority*,

911 F.3d at 700 (quoting *Fitzgerald*, 555 U.S. at 257). A plaintiff can establish the Title IX liability of a defendant school board "by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference." *See Fitzgerald*, 555 U.S. at 257–58. However, "[b]ecause there is no theory of *respondeat superior* for constitutional torts," a plaintiff must plead that harassment resulted from conduct directly attributable to a specific defendant—whether individual educator or municipal entity—in order to maintain her § 1983 claim against them. *See id.*; *Feminist Majority*, 911 F.3d at 703 (quoting *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010)).

      *i.     Plaintiff has stated an equal protection claim against the Board.*

To properly state a § 1983 claim against the Board, Plaintiff must allege that R.W.'s abuse resulted from "a municipal custom, policy, or practice." *Fitzgerald*, 555 U.S. at 257–58. Members of the Board needn't have "personally participated in or expressly authorized" harassment. *See Avery v. Cty. of Burke*, 660 F.2d 111, 114 (4th Cir. 1981). Rather, official policy or custom can be established by demonstrating the Board's "tacit authorization of or deliberate indifference to constitutional injuries." *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

Drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has plausibly alleged that the Board acted with deliberate indifference to known, ongoing harassment at Estes Hills, and that R.W.'s abuse was prolonged as a result. *See Feminist Majority*, 911 F.3d at 703 (acknowledging the "substantial similarity" between the standards for deliberate indifference claims under Title IX and § 1983). According to the complaint, Carnahan communicated Hayes's initial report to the Board's central office shortly after it was made. (ECF No. 1 ¶ 37.) Thereafter, the administration took remedial measures that were

"clearly unreasonable" under the circumstances. *See supra* at III.A.ii. However, based on Mazor's interactions with District Office representatives, we can infer that the administration's chosen approach received at least tacit authorization. (*See* ECF No. 1 ¶ 28.) Put another way, the complaint alleges that the Board was aware that students were being sexually abused, had the authority to direct a remedy that was not "clearly unreasonable," yet chose not to do so. (*See id.* ¶¶ 43–44, 46.) Those allegations are sufficient to support Plaintiff's § 1983 claim against the Board. *See Miller v. Union Cty. Pub. Sch.*, No. 3:16-cv-00666-FDW-DCK, 2017 WL 3923977, at *5–6 (W.D.N.C. Sept. 7, 2017) (denying defendant school board's motion to dismiss equal protection claim when student alleged that officials knew she had suffered "multiple incidents of harassment" by another student but "declined to investigate or impose remedial action").

ii. *Plaintiff has stated an equal protection claim against the Individual Defendants.*

In addition to the governing school board, a plaintiff can bring an equal protection claim for deliberate indifference to known student-on-student sexual abuse against individual administrators. To state such a claim in the Fourth Circuit, the plaintiff must plausibly allege that: (1) the victim was subjected to sexual harassment by his peers; (2) that administrators responded "with deliberate indifference, i.e. in a manner clearly unreasonable in light of the known circumstances"; and (3) that the administrators' responses were "motivated by a discriminatory intent." *See Feminist Majority*, 911 F.3d at 702–03.

Here, the first element is easily satisfied; as the above discussion makes clear, the complaint contains substantial allegations that R.W. was regularly abused by his schoolmates. The allegations supporting the second element—whether each of the Individual Defendants responded to known harassment with deliberate indifference—are thinner:

15

- Defendant Carnahan, the principal at Estes Hills, allegedly told Hayes to "stay out of it" when Hayes came to her with R.W.'s disclosure, and insisted that things were "being handled," (ECF No. 1 ¶ 37);

- Defendant Clary, an assistant principle at the school, allegedly spoke with R.W. on the day of his initial disclosure, but did not contact Plaintiff thereafter, (*id.* ¶¶ 30, 35, 38);

- Defendant Jackson, the school's guidance counselor, allegedly dismissed the idea that the school should contact the Department of Social Services, suggesting instead that an OCRCC puppet show would be an appropriate remedy, (*see* ECF No. 2-2 ¶ 10); and

- Defendant Kueffer, the director of the systems-level programs, allegedly "scoffed at [Mazor's] concerns" about the boys' allegations, called them "manipulative," and "implied that they were liars," (ECF No. 2-1 at 3).

While these allegations, on their own, would likely be insufficient to support an inference that the Individual Defendants were deliberately indifferent to student-on-student abuse, the broader complaint—which alleges that no victims were interviewed, no parents were notified, and no perpetrators were seriously evaluated or disciplined—tips the balance in favor of plausibility. The Individual Defendants were all aware of R.W.'s allegations, and, despite their roles at Estes Hills, failed to act in ways "reasonably calculated to end the harassment." *See Feminist Majority*, 911 F.3d at 689 (citing *Zeno*, 702 F.3d at 669). Finally, the Court finds that the third element—discriminatory intent—is also adequately pleaded as to each of the Individual Defendants. In *Feminist Majority*, the Fourth Circuit held that a complaint "sufficient[ly] . . . stated the intent element of [an] equal protection claim" when it alleged that a university president "sought to downplay . . . harassment" and "made no effort to stop [it]." *See id.* at 703. Plaintiff has likewise alleged that the Individual Defendants were either openly skeptical of, or inclined to minimize, R.W.'s disclosure and did little to stop the alleged

16

harassment—a sufficient basis from which to infer discriminatory intent. *See Grindle*, 599 F.3d at 589 (concluding that jury could properly infer discriminatory intent from principal's downplaying of and failure to stop harassment).

In short, the Court concludes that Plaintiff has plausibly stated a § 1983 equal protection claim against each of the Individual Defendants. Before moving on, however, there are two other issues to address. First is the question of whether the Individual Defendants are entitled to qualified immunity. In their opening brief, the Individual Defendants lay out the familiar two-part qualified immunity standard: that government actors are immune from suit unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was 'clearly established'" at the time of the alleged misconduct. (ECF No. 20 at 20 (quoting *Doe v. Durham Pub. Sch. Bd. of Educ.*, No. 1:17cv773, 2019 WL 331143, at *18 (M.D.N.C. Jan. 25, 2019)). However, they devote all of their attention to the first question—whether a constitutional violation has been adequately alleged—and say nothing of the second—whether the violated right was clearly established. Furthermore, while Plaintiff argues in her response brief that the right in question *was* clearly established at the time of the alleged violations, (*see* ECF No. 22 at 18–19), the Individual Defendants do not respond to this argument at all in their reply, (*see* ECF No. 28). Thus, for the time being, the Court rejects the Individual Defendants' contention that they are entitled to qualified immunity. *See Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007) (explaining that, with respect to qualified immunity, "[t]he defendant bears the burden of proof on the second question").

As for the second issue: Plaintiff has sued each of the Individual Defendants in both their individual and official capacities. (ECF No. 1 at 1.) It is generally recognized that official

capacity suits "represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Accordingly, when a plaintiff asserts a claim directly against a school board, the same claim brought against school administrators in their official capacities is redundant. *See Doe*, 2019 WL 331143, at *20 (citing *Talley v. City of Charlotte*, No. 3:14-cv-00683-MOC-DCK, 2016 WL 8679235, at *13 (W.D.N.C. July 22, 2016)). Here, the § 1983 claims against the Individual Defendants in their official capacities are wholly duplicative of those against the Board; therefore, they will be dismissed.

### C. State Law Claims

The Court now turns to Plaintiff's various state law claims,[4] which Defendants assert are barred, in whole or in part, by governmental and public official immunity. (*See* ECF Nos. 17 at 16; 20 at 11.) In North Carolina, local governments are shielded from certain lawsuits by the doctrine of governmental immunity. Under the doctrine, a school board is ordinarily immune from suit for injuries caused by its employees in the course of doing their jobs. *See, e.g.*, *Seipp v. Wake Cty. Bd. of Educ.*, 510 S.E.2d 193, 194 (N.C. Ct. App. 1999). By statute, a school board can waive its governmental immunity by purchasing liability insurance. *See* N.C. Gen. Stat. § 115C-42. However, waiver only extends as far as the terms of the applicable insurance policies themselves—unless the alleged injury is actually covered, governmental immunity has not been waived. *See Beatty v. Charlotte–Mecklenburg Bd. of Educ.*, 394 S.E.2d 242, 244 (N.C. Ct. App. 1990).

---

[4] The complaint includes state law claims for gross and ordinary negligence, intentional and negligent infliction of emotional distress, the incurred expense of medical and counseling services, and the loss of service and companionship of a child. (*See* ECF No. 1 ¶¶ 65–92.) Plaintiff's claim alleging violations of the North Carolina Constitution will be addressed separately in the next subsection.

As it relates to this case, the Board had three insurance policies in place during the relevant time period. (*See* ECF Nos. 17-1 through 17-6; 27-1 ¶¶ 4–5.) By their express terms, however, the policies exclude coverage for torts arising out of abuse or molestation, whether on school grounds or on the bus. (*See* ECF Nos. 17-1 at 125, 139; 17-2 at 130, 144; 17-3 at 217, 247; 17-4 at 229, 261; 17-5 at 30, 46; 17-6 at 31, 48.) Because all of Plaintiff's state law claims stem from the Board's alleged failure to prevent ongoing sexual abuse, they fall outside of the purchased coverage. Thus, the Board is entitled to governmental immunity, and Plaintiff's state law claims against it must be dismissed. *See Biggs v. Edgecombe Cty. Pub. Sch. Bd. of Educ.*, No. 4:16-CV-271-D, 2018 WL 4471742, at *9 (E.D.N.C. Sept. 18, 2018) (holding that school board was entitled to governmental immunity where the applicable policy excluded claims arising out of sexual misconduct). The same is true for any state law claims directed at the Individual Defendants in their official capacities. *See, e.g.*, *Mullis v. Sechrest*, 495 S.E.2d 721, 723, 725 (N.C. 1998) (holding that a teacher sued in his official capacity is entitled to governmental immunity to the same extent as the school board that employs him).

The state law claims against the Individual Defendants in their individual capacities require further analysis. Because individual capacity claims seek recovery from government officials or employees directly, governmental immunity does not apply. *See Meyer v. Walls*, 489 S.E.2d 880, 887 (N.C. 1997). However, pursuant to the separate and distinct doctrine of public official immunity, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere

negligence in respect thereto."[5]  *Id.* at 888.  Unlike governmental immunity, which is quite robust, the availability of public official immunity is curtailed by two important limitations. First, as the name implies, public official immunity is available only to public *officials*—it does not apply to claims against "mere employee[s]."  *Id.* at 889.  Second, the cloak of public official immunity can be pierced if a plaintiff can show that the defendant's conduct was "(1) corrupt; (2) malicious; (3) outside of and beyond the scope of [their] duties; (4) [taken] in bad faith; or (5) willful and deliberate."[6]  *See Smith v. Jackson Cty. Bd. of Educ.*, 608 S.E.2d 399, 411 (N.C. Ct. App. 2005).

Three of the Individual Defendants—Carnahan, Clary, and Kueffer—contend that they are entitled to public official immunity on all of Plaintiff's state law claims.[7]  (*See* ECF No. 20 at 11–16.)  In their roles as principal and assistant principal, respectively, Carnahan and Clary were clearly "public officials" under North Carolina law.  *See Farrell v. Transylvania Cty. Bd. of Educ.*, 625 S.E.2d 128, 134 (N.C. Ct. App. 2006).  Plaintiff does not argue otherwise. (ECF No. 22 at 8.)  In contrast, the parties disagree as to whether Kueffer—the director of

---

[5] As Plaintiff correctly notes, public official immunity applies only to claims sounding in negligence; it therefore presents no bar to Count V of the complaint, which pleads intentional infliction of emotional distress.  (*See* ECF Nos. 1 ¶¶ 82–86; 22 at 8 (citing *Hawkins v. State*, 453 S.E.2d 233, 242 (N.C. Ct. App. 1995).)  The Individual Defendants do not address this point and effectively concede it.

[6] As the North Carolina Court of Appeals has explained, "a public official sued individually is not liable for 'mere negligence' . . . because such negligence *standing alone*, is insufficient to support the 'piercing' . . . of the cloak of official immunity."  *See Epps v. Duke Univ., Inc.*, 468 S.E.2d 846, 853 (N.C. Ct. App. 1996).  However, "once stripped of the 'cloak' of office, the public official *qua* individual is . . . liable just like any other private individual," even for simple negligence.  *See id.* at 852–53.

[7] The Individual Defendants make no argument that Jackson—a guidance counselor—is a public official deserving of immunity.

system level programs at Estes Hill—exercised sufficient supervisory authority and discretion to be properly deemed a public official. (*See* ECF Nos. 20 at 15; 22 at 8.)

The Court, however, need not resolve the question of Kueffer's status at this juncture, because Plaintiff has sufficiently alleged that *all* of the Individual Defendants—whether public official or mere employee—behaved in a malicious, willful, and deliberate manner. It is true that a "conclusory allegation that a public official acted willfully and wantonly" is insufficient to withstand dismissal. *See Meyer*, 489 S.E.2d at 890. However, as explained above, the allegations in the complaint provide a fact-rich, detailed account of the Individual Defendants' response to known sexual abuse. As Plaintiff highlights in her briefing, (*see* ECF No. 22 at 8–10) a number of the specific allegations in her complaint align with cases in which North Carolina courts have allowed public official immunity to be pierced. In *Martin v. Moreau*, for example, the North Carolina Court of Appeals found that allegations showing that a highway-patrol training officer was (1) aware that a cadet had suffered a severe injury, but (2) failed to provide aid within a reasonable timeframe were "sufficient to defeat the immunity defense" raised in a motion to dismiss. *See* 770 S.E.2d 390 (N.C. Ct. App. 2015). The same goes for the allegations here: Plaintiff has alleged that the Individual Defendants knew of a severe injury—sexual abuse—but failed to take reasonable remedial action. Likewise, in *Smith v. Jackson County Board of Education*, the Court of Appeals found that allegations that a defendant sheriff (1) knew that one of his deputies had previously assaulted a minor, but (2) nevertheless assigned him to work as a school resource officer were sufficient to stave off a public immunity defense at the pleadings stage. *See* 608 S.E.2d at 411. Again, the allegations here are not so far removed; the Individual Defendants knew that older students were abusing R.W. and

21

others, but nevertheless allowed them to interact on a regular basis. The Court cannot, therefore, conclude that the Individual Defendants are entitled to public official immunity at this time.

In sum, governmental immunity bars Plaintiff's state law claims against the Board. Those brought against the Individual Defendants in their official capacities fail for the same reason. However, Plaintiff may advance her state law claims against the Individual Defendants in their individual capacities, as none are presently entitled to public official immunity.

### D. North Carolina Constitution

Finally, all Defendants move to dismiss Plaintiff's claim for violations of rights allegedly guaranteed by Articles I and IX of the North Carolina Constitution. (*See* ECF Nos. 1 ¶¶ 93–99; 17 at 19–21; 20 at 22–23.) Article I contains the North Carolina Constitution's equal protection clause, which, similar to its federal counterpart, states that "[n]o person shall be denied the equal protection of the laws." N.C. Const. art. 1, § 19. Article IX provides for "a general and uniform system of free public schools, . . . wherein equal opportunities shall be provided for all students." *Id.* art. IX, § 2.

Despite the sweeping language of those provisions, they do not appear to create or secure a right to receive a public education in an environment free from harassment or abuse. *See, e.g.*, *Doe v. Charlotte–Mecklenburg Bd. of Educ.*, 731 S.E.2d 245, 252–54 (N.C. Ct. App. 2012) (declining to recognize student's claim that her "educational rights" under the North Carolina Constitution were violated by a school's failure to prevent alleged sexual abuse by a teacher); *see also Sauers v. Winston-Salem/Forsyth Cty. Bd. of Educ.*, 179 F. Supp. 3d 544, 548, 558 (M.D.N.C. 2016) (rejecting student's claim that he was denied "equal access to participation

in the public school system" under the North Carolina Constitution when teachers bullied him for having dyslexia); *J.W. v. Johnston Cty. Bd. of Educ.*, No. 5:11–CV–707–D, 2012 WL 4425439, at *16 (E.D.N.C. Sept. 24, 2012) (dismissing plaintiff's claim that he was deprived of a state constitutional right to "an education free from harm and psychological abuse"). Plaintiff cites no cases which suggest otherwise.

Instead, Plaintiff urges this Court to recognize such a right based on the federal equal protection jurisprudence discussed above. However, it would be improper to do so. (*See* ECF No. 21 at 20); *Sauers*, 179 F. Supp. 3d at 559. The Supreme Court of North Carolina has, at times, looked to the meaning and construction of the Fourteenth Amendment's Equal Protection Clause when determining the scope of Article I, Section 19 of the North Carolina Constitution. *See, e.g.*, *White v. Pate*, 304 S.E.2d 199, 203–04 (N.C. 1983). However, the two clauses are not bound in lockstep. "[I]n the construction of [a] provision of the [North Carolina] Constitution, the meaning given by the Supreme Court of the United States to even an identical term in the [U.S.] Constitution . . . is, though highly persuasive, not binding" upon North Carolina courts. *Id.* at 203. Moreover, when sitting in diversity, this Court's role is to "rule upon state law as it exists," rather than "surmise or suggest its expansion." *See Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993). Absent North Carolina caselaw holding otherwise, this Court will not presume that, like its federal counterpart, Article I, Section 19 of the North Carolina Constitution guarantees a right to be free from sexual harassment in a public educational setting. Accordingly, Plaintiff's state constitutional claim will be dismissed as to all Defendants.

23

## IV. CONCLUSION

To summarize, the Court's key conclusions are as follows. As against the Board: Plaintiff has plausibly alleged both a Title IX claim and a § 1983 equal protection claim; however, her state law claims are barred by governmental immunity. As against the Individual Defendants: all official capacity claims will be dismissed as duplicative of those brought against the Board; however, Plaintiff's individual capacity § 1983 and state law claims may all advance. Last, Plaintiff has failed to state a valid claim under the North Carolina Constitution.

The Court therefore enters the following:

## ORDER

IT IS THEREFORE ORDERED that the Motion to Dismiss filed by Defendant Chapel Hill-Carrboro City Schools Board of Education, (ECF No. 16), is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Plaintiff's claims brought pursuant to the laws and constitution of North Carolina. The motion is DENIED with respect to Plaintiff's claims brought pursuant to Title IX and § 1983.

IT IS FURTHER ORDERED that the Motion to Dismiss filed by Defendants Cheryl Carnahan, Elizabeth Clary, Nancy Kueffer, and Ronnie Jackson, (ECF No. 19), is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to all claims brought against these defendants in their official capacities, as well as Plaintiff's claim under the North Carolina Constitution brought against them in their individual capacities. The motion is DENIED with respect to Plaintiff's individual capacity § 1983 claim, as well as her remaining individual capacity state law claims.

This, the 9th day of June 2020.

/s/Loretta C. Biggs
United States District Judge